**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

| | |
|---|---|
| **PRECIOUS SCOTT,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO.: 5:18-CV-158**<br>**(JUDGE STAMP)** |
| **NANCY A. BERRYHILL,**<br>**Acting Commissioner of Social Security,** | |
| **Defendant**. | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On September 20, 2018, Plaintiff Precious ShaVon Scott ("Plaintiff"), *pro se*, filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g. (Compl., ECF No. 1).  On November 20, 2018, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No. 14; Admin. R., ECF No. 15. On February 19, 2019, and May 15, 2019, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 35; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 58).  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  <u>PROCEDURAL HISTORY</u>

Plaintiff received supplemental security income benefits based on childhood disability. R. at 95. The law requires that upon turning eighteen, benefits shall be redetermined under the rules determining disability in adults. <u>Id.</u> On March 25, 2013, the Commission determined that, as of March 9, 2013, Plaintiff was no longer disabled because of Plaintiff's failure to attend her redetermination evaluations. R. at 89. Plaintiff submitted a request for reconsideration of this decision with the Social Security Administration on April 5, 2013. R. at 178. The determination that Plaintiff was no longer disabled was upheld by a State agency Disability Hearing Officer on September 18, 2013. R. at 187-91. As Plaintiff failed to attend requested testing, the State agency Disability Hearing Officer based her decision on Plaintiff's medical records. <u>Id.</u>

On December 12, 2013, Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ") to appeal the State agency Officer's decision. R. at 194. This hearing was held before United States ALJ Laura Speck Havens on June 26, 2014, in Tucson, Arizona. R. at 71.  Plaintiff, without the assistance of counsel, appeared and testified; the hearing was then closed pending consultative evaluations. R. at 81. After considering all relevant evidence, the ALJ issued an unfavorable decision to Plaintiff on September 18, 2014, finding that she was not disabled within the meaning of the Social Security Act. R. at 103.

Plaintiff requested review of the ALJ's decision on October 22, 2014. R. at 206. On May 10, 2016, the Appeals Council granted Plaintiff's request for review and remanded her case back to an ALJ for examination with respect to the issue of disability between March 9, 2013, and July 9, 2015. R. at 110. Additionally, the Appeals Council affirmed the State agency's decision in regards to Plaintiff's disability after July 9, 2015. <u>Id.</u>

A hearing to address the remanded issues was scheduled for January 11, 2017; however, the plaintiff was unable to attend due to vision problems and leg weakness. R. at 266. On March 1, 2017, the rescheduled hearing was held before United States ALJ Laura Speck Havens in Tucson, Arizona. R. at 53. Plaintiff, without the assistance of counsel, appeared. Id. Also present by telephone were Valerie Williams, an impartial vocational expert and Dr. Irvin S. Belzer, an impartial medical expert. Id. At the request of Plaintiff and her mother, testimony was taken from Dr. Belzer and further proceedings were postponed to attaining council. R. 54-55.

A final hearing was held by video teleconference on September 25, 2017, before United States ALJ Lawrence T. Ragona with the Honorable Judge presiding from Alexandria, Louisiana while Plaintiff appeared in Monroe, Louisiana. Suppl. R. at 18. Plaintiff was assisted by Counsel Nina C. Coleman, and Beverly K. Majors, an impartial vocational expert was also present. Id. During this hearing, questions were asked of Plaintiff, Plaintiff's mother, and the vocational expert. Id.

On January 26, 2018, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act between March 1, 2013 and July 9, 2015. R. at 15. Plaintiff submitted a request for review of this unfavorable decision on March 19, 2018. R. at 319. On July 20, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. at 9.

## III.   BACKGROUND

### A.   Personal History

Plaintiff was born on September 24, 1994, and was eleven years old at the time she began receiving supplemental social income benefits. R. at 89. She completed fifth grade through public schooling before being homeschooled through approximately eighth grade. R. at 11.

Plaintiff has no prior work experience. R. at 75. She was single at the time she filed her initial claim as well as at the time of the administrative hearing. R. at 10. She has no dependent children. R. at 10. Plaintiff alleges disability based on multiple sclerosis, ocular neuritis, ataxia, bladder incontinence, migraine headaches, dyslexia, obesity, and depression. R. at 11-28.

**B.    Medical History**

   **1.  Medical History Pre-Dating Alleged Onset Date of March 1, 2013.**

   On March 30, 2006, Plaintiff was examined by Dr. Thomas Staats at Comprehensive Assessments. Inc. and was diagnosed with provisional depressive disorder with psychotic features and a learning disorder by history. R. at 471.

   On January 2, 2012, the Plaintiff was seen at Homer Memorial Hospital for a sore throat and congestion. R. at 550.She presented with joint pain, rash, and a headache; her chart also noted mental illness. Id. Plaintiff was diagnosed with acute sinusitis and discharged. R. at 555. On January 17, 2012, Plaintiff visited the Homer Memorial Hospital with neck pain/stiffness and a headache. R. at 542. Her chart indicated blurred vision, hearing impairment, joint pain, a rash, mental illness, and a headache. Id. An x-ray found no fractures or other back issues and Plaintiff was discharged and sent home. R. at 547, 567. On January 30, 2012, the Plaintiff was examined at Homer Memorial Hospital where she presented with a sore throat and a rash on her arms. R. at 533. She was diagnosed with acute sinusitis. R. at 537.

   On February 21, 2012, Plaintiff visited Dr. Salmon and seen about pain in her shoulder blade and a rash on her arms. R. at 561. Dr. Salmon diagnosed her with subscapular bursitis, a cervical strain, and dermatitis. Id. She was prescribed Medrol Dosepak, triamcinolone cream, and parafon. Id. Plaintiff was then seen by Dr. Clifton Salmon on February 28, 2012, where she

complained of a rash on her wrist. R. at 560. Dr. Salmon diagnosed her with dysfunctional uterine bleeding and dermatitis. Id.

On March 1, 2012, Plaintiff was seen by Dr. Salmon and complained of nausea and abdominal pain. Id. She was diagnosed with acute gastritis and prescribed medication. Id. Plaintiff was seen again by Dr. Salmon on March 5, 2012, for a follow-up on the rash on her arm. Id. Dr. Salmon noted the dermatitis improved and recommended the continued medication. Id.

On July 13, 2012, Plaintiff was seen at Homer Memorial Hospital for left ankle pain. R. at 525. She presented with blurred vision, a headache, joint pain, and a rash. Her chart noted hearing impairment and mental illness. Id. She was diagnosed with a left ankle sprain; an x-ray noted no fractures. R. at 529, 562. On July 18, 2012, Plaintiff was admitted to Minden Medical Center with foot pain and was discharged with ibuprofen as no fractures were found via an x-ray. R. at 475. On July 19, 2012, Plaintiff was seen by Dr. Clifton Salmon for a follow-up on her left ankle sprain. R. at 559. The ankle had been wrapped since her emergency room visit and she was sent home with instructions to rest and elevate the ankle. Id.

On August 9, 2012, Plaintiff was examined at Homer Memorial Hospital after complaining of left rib pain. R. at 505. Her vision was blurred, her chart noted hearing impairment and mental illness and she presented with a rash and headache. R. at 516. An X-ray revealed no fractures or pneumothorax effusion. She was diagnosed with a contusion of her left ribs and discharged to home. R. at 521.

On September 5, 2012, Plaintiff received an X-ray at Homer Memorial Hospital after complaining of right knee pain; no fractures or dislocation were found. R. at 504. Her chart noted blurred vision, hearing impairment, joint pain, a rash, and mental illness. R. at 507. She was

diagnosed with a contusion on the right knee and discharged with a bandage. R. at 511. On September 13, 2012, Plaintiff was seen at the Homer Memorial Hospital and complained of pain from a motor vehicle accident. R. at 493. The doctor performed x-rays which found no fractures or other problems were noted with her knees, neck, or chest. R. at 501. Plaintiff was seen by Dr. Clifton Salmon on September 25, 2012, where she complained of lingering back pain after the motor vehicle accident. Id. She was prescribed pain medication—Medrol Dose Pack, Flexeril, and Lortab—and sent home. Id. On September 30, 2012, Plaintiff was diagnosed with a sore throat at Homer Memorial Hospital and she presented with a headache. R. at 484. At this time, her chart showed hearing impairment, a heart murmur, joint pain, a rash, and mental illness. R. at 485.

Plaintiff visited Greenacres Clinic on October 1, 2012, to be seen about injuries related to an auto accident. R. at 569. She complained of severe neck pain, upper and lower back pain, and aching pain in her right knee. R. at 570. An examination found reduced motion in her back, moderate muscle spasms, and tenderness in her lumbar region. Id. She was treated with the NeuroMechanic technique and electrical muscle stimulation. Id. On October 8, 2012, Plaintiff was diagnosed with segmental dysfunction cervical, cervical sprain/strain, segmental dysfunction thoracic, segmental dysfunction lumbar, segmental dysfunction pelvic, and a knee strain at Greenacres Clinic. R. at 571. The Clinic recommended treatment for four weeks with two treatments of spinal manipulation per week. Id. Plaintiff missed an appointment on November 2, 2012. Id.

On November 27, 2012, Plaintiff visited Greenacres Clinic and complained of severe neck pain and similar upper and lower back pain and knee pain as her last visit. Id. The Clinic found reduced mobility in her back, moderate muscle spasms, and moderate tenderness in her

neck and back. Id. Plaintiff received treatment through the Diversified technique and electrical muscle stimulation and told to continue to attend appointments twice a week. Id. Plaintiff again visited Greenacres on November 28, 2012, with similar symptoms, although she noted an improvement in her neck pain and a worsening of her upper back pain. R. at 572. Plaintiff received treatment using the Diversified Technique and electrical muscle stimulation. Id. On November 30, 2012, Plaintiff visited Greenacres with similar complaints of neck and back pain. Id. She noted that her neck pain had worsened while her upper back pain had improved. Id. At this visit, she complained of headaches over her entire head. Id. Greenacres made similar findings and continued the treatment for plaintiff of the Diversified technique and electrical muscle stimulation. R. at 572-73. Plaintiff missed appointments with Greenacres on December 3 and 5, 2012. R. at 573.

### 2.   Medical History Post-Dating Alleged Onset Date of March 1, 2013.

On March 22, 2013, Plaintiff visited Dr. Julee Botica, a mental health specialist for review. R. at 574. The specialist, Dr. Botica, noted that she was a slow learner and suffered from dyslexia. Id. Plaintiff then missed two evaluations with Dr. Botica. Id.

Plaintiff was seen at El Rio Community Health Center on November 15, 2013. R. at 659. She presented with balance issues, knee pain, and ear pain. Id. She tested negative for anxiety and depression, but was found to have dizziness, loss of balance, and gait disturbance. R. at 661. She was diagnosed with sinusitis and given augmentin and loratadine. R. at 664. The clinic requested x-rays to be done for Plaintiff's knee pain and she was prescribed naproxen. Id.

On December 5, 2013, Plaintiff visited the Emergency Department of Carondelet Health Network complaining of right knee pain, an earache, a sore throat, and feeling of being off balance. R. at 712. Plaintiff also reported some nausea, but no vomiting or diarrhea. Id. She

reported a mild frontal and bi-temporal headache. Id. Plaintiff also complained of low back pain in the lumbar area of the back in the midline which had persisted for three days. Id. Plaintiff was diagnosed with vertigo, a right knee sprain, and pharyngitis. R. at 714. An x-ray of the right knee was administered that showed no fracture and Plaintiff was given a knee immobilizer and crutches. Id. She was prescribed Percocet for the knee pain and sore throat. Id. The doctor administered Strep and mono tests, which both came back negative; her pharyngitis was pronounced viral. Id. Plaintiff was prescribed antivert and Zofran which reduced her vertigo symptoms. Id. Plaintiff was discharged and told to follow-up with her regular doctor; she was also referred to an orthopedist. Id. She was also given a prescription for Percocet, Antivert, and Phenergan. Id.

On January 7, 2014, Plaintiff received a spine CT without contrast at Carondelet Health Network due to a fall and neck pain. Id. The exam revealed no focal prevertebral soft tissue swelling and found the predental interval to be within normal limits. Id. There was a normal relationship of the occipital condyles and lateral mass of C1. Id. The plaintiff showed no acute fractures and the visualized mastoid and middle ear cavities were aerated. Id. Plaintiff was also given a head or brain CT without contrast due to weakness and dizziness. R. at 698). The CT revealed no midline shift, mass effect or abnormal extra-axial fluid collections. Id. There was no acute inter-cranial hemorrhage or imbalance of gray-white matter differentiation. Id. It revealed aerated visualized paranasal sinuses, mastoids, and intact calvarial structures. Id.

On January 7, 2014, Plaintiff also received an MRI of the lumbar spine without contrast due to multiple falls, vertigo, and back pain. R. at 705. It revealed that the conus terminated at L1 and there were no definitive cord signal abnormalities. Id. Some limitation occurred due to motion, but no significant central canal stenosis was noted. Id. The MRI found no disc

herniations and found that the vertebral body and disc space heights were preserved. R. at 705-06. There was probable trace dependent edema in the posterior back subcutaneous fat, but no abnormal signal seen in the visualized sacral ala. Id. at 706.

On January 8, 2014, Plaintiff received a brain MRI with contrast from Carondelet which revealed a clinical indication of multiple sclerosis. R. at 700. At this time, plaintiff complained of a weak and unsteady gait which left her unable to walk without help. R. at 722. She had suffered several falls since November 2013. Id. The previous medications prescribed for vertigo had not helped her symptoms. Id. She also complained of a numbness and tingling in her legs and neck pain going down her right arm. R. at 726. In addition, Plaintiff has been unable to sleep well. Id. All weakness extended over her bilateral lower extremities and sometimes resulted in bilateral lower extremity leg cramps. R. at 723. The Plaintiff was unable to stand up. R. at 728. Plaintiff was admitted to the neurology floor for evaluation and treatment. R. at 724. She was also given diet and nutrition counseling and Ativan for anxiety. R. at 725. For her bilateral lower extremity muscle cramps, plaintiff was prescribed Flexeril. Id. Plaintiff was also prescribed physical and occupational therapy for her ataxia and heparin for her prophylaxis. Id. Plaintiff was prescribed Solu-Medrol. R. at 728. The MRI revealed multiple areas of T2 signal abnormality and minimal enhancement along the periphery of a lesion in the left corona radiata. Id. On the same date, Plaintiff also received a cervical spine MRI with contrast which revealed acute MS. Id. The MRI found subtle areas of enhancement along the right side of the spinal cord and were consistent with some of the changes being related to an active or acute demyelinating process. R. at 701. Plaintiff also received a thoracic spine MRI with contrast revealing acute MS. Id. This MRI revealed patchy abnormal enhancement scattered throughout the spinal cord, especially at T1 and T2. Id.

9

There were also patchy areas of enhancement at T3, T5, and at T9-10, which was consistent with an active demyelinating process. Id. An MRI of the thoracic spine without contrast was also administered due to the plaintiff's inability to control her legs and her experience of body pain and weakness. R. at 702. The MRI revealed plaintiff's alignment to be within normal limits and no significant anterior-posterior subluxation. Id. There were small depressions along mid-thoracic vertebral bodies and no abnormal edema in the paraspinous muscles or soft tissue. Id. The MRI also revealed areas of cord signal abnormality (especially at T3, T5-6, and T10. Id. Some ventral cord signal change at the conus at T12 was suspected but no cord expansion was found. Id. Patchy signal cord changes were suspected at T7-9, but no disc herniations were revealed. Id. An MRI of the cervical spine without contrast revealed a straightening of the cervical spine and no evidence of an acute compression fracture. R. at 703.

Plaintiff also received an MRI of the brain without contrast. R. at 704. This MRI found that Plaintiff was "negative for midline shift, mass effect, or abnormal extraaxial fluid collections." R. at 705. There were multifocal signal changes seen in the cerebral white matter which were perpendicularly oriented to the ventricular margin and most consistent with multiple sclerosis. Id. There was no evidence of chronic hemorrhage and the cerebellar tonsils were normally located. Id.

On January 10, 2014, Plaintiff was admitted to Carondelet Health Network with lower extremity weakness that was progressive with multiple falls occurring. R. at 719. Plaintiff was diagnosed with probable multiple sclerosis, a urinary tract infection, hyperglycemia related to steroid therapy, a headache, and transient elevation of blood pressure that was likely related to pain. Id. She received a lumbar puncture. R. at 697. At the time of discharge, on January 15, 2015, Plaintiff was stable and no further diagnostic studies were ordered. R. at 720. During her

hospital stay, Plaintiff was stressed and emotional over her diagnosis and was evaluated by the psychiatric team, who recommended her for discharge with resources as she was not an immediate threat. Id. She was told to schedule a follow-up appointment with Dr. David Siegel of Western Neurosurgery and the El Rio Clinic. Id.

On January 24, 2014, Plaintiff went to El Rio Community Health Center for a follow-up from her hospital visit. R. at 654. She complained of continued difficulty balancing and pain/muscle cramps in her legs. Id. She also noted depression due to her new diagnosis. Id. Plaintiff noted chronic problems with reactive depression, hypothyroid, balance impairment, and muscle spasms. Id. Her neurological exam was normal, but she demonstrated symptoms of depression. R. at 656. She was prescribed medication for her hypothyroid and was immediately referred to neurology due to the possibility of multiple sclerosis. R. at 657. Plaintiff was referred to Integrated Behavioral Health for help with reactive depression and given medication to help with muscle spasms. Id.

On February 13, 2014, Plaintiff was seen at Carondelet Health Network complaining of a migraine which she said had persisted for four to five days. R. at 707. She complained of a history of migraines, unsteadiness, and balance problems. Id. Her previous admission to the hospital revealed evidence of multiple sclerosis. Id. She stated that her balance problems persisted. Id. She was given Dilaudid and Phenergan which significantly resolved her headache. R. at 709. Plaintiff was given a head CT without contrast which showed no bleed, shift or hydro. Id. Plaintiff was discharged in a stable condition and told to follow-up with her regular doctor and a neurologist. Id. On February 14, 2014, Plaintiff was given a head/brain CT without contrast at Carondelet after complaining of a headache due to head trauma. R. at 710. Plaintiff's

ventricles and cerebral sulci were within normal limits for her age. Id. The small foci of hypodensity in the periventricular white matter were consistent with multiple sclerosis. Id.

On March 12, 2014, Plaintiff was seen at Western Neurosurgery. R. at 671. This was a follow-up visit after plaintiff's admission to St. Joseph's hospital on January 8, 2014 for multiple sclerosis. Id. Plaintiff complained of spinal pain and migraines. Id. Western Neurosurgery diagnosed plaintiff with ataxia, multiple sclerosis, and an abnormal MRI. Id. Her psychiatric exam revealed her to be cooperative but disinterested, as she looked at her iPod and played music during the evaluation. R. at 673. Western Neurosurgery recommended Copaxone for the multiple sclerosis and referred her to El Rio for follow-up visits. R. at 674.

On March 21, 2014, Plaintiff went to El Rio Community Health Center and was seen about a tick bite, an earache, and a thyroid problem. R. at 647. She noted chronic reactive depression, hypothyroid, balance impairment, and muscle spasms. Id. Plaintiff was urged to have bloodwork taken to diagnose hypothyroidism but refused. R. at 652. She was referred to an ophthalmologist for visual issues and a gastroenterologist due to a loss of appetite. Id. The Clinic referred her to a behavioral health specialist regarding her reactive depression. Id. She had no ear infection and was given ear drops. Id. Plaintiff was given medication for seasonal allergies and a cough. Id. She was also screened for Lyme disease regarding her tick bite and the test came back negative. R. at 666.

On May 9, 2014, Plaintiff was seen at St. Joseph's Hospital complaining of increasing bilateral leg pain and loss of balance. R. at 880. She was diagnosed with worsening ataxia with a history of MS, MS exacerbation, and obesity. R. at 884. She was admitted to the hospital in stable condition. R. at 885. Plaintiff denied any significant vision changes but did note occasional black dots being seen in her eyes. R. at 736. She complained of feeling feverish over

two days. Id. She was seen by neurology and the hospitalist and given intravenous steroid therapy for her multiple sclerosis. Id. The neurologist felt that the symptoms were a gradual progression of her multiple sclerosis. Id. He recommended an MRI and physical therapy. R. at 734-35.

At one point during her hospital stay, plaintiff became agitated when she was not allowed to go to the parking lot with her boyfriend. Id. At this time, she threatened to leave against medical advice and bargained for additional pain medication. Id. She also refused to allow her intravenous catheter to be removed which resulted in security being called. Id. She attempted to leave with the IV in her arm and seemed that she intended to use the access for unprescribed substances. Id. On May 10, 2014, Plaintiff left against medical advice with the IV in place and became violent when being advised that the IV needed to be removed before discharge. Id. On May 10, 2014, Plaintiff went to Carondelet Health Network to be seen regarding her imbalance and stiffness of her lower limbs. R. at 641. The MRI showed enhanced plaque in the brain and spinal cord. Id. On May 11, 2014, Plaintiff went to Tucson Medical Center and was seen by the neurology unit. R. at 623. She complained of visual baseline disturbances and altered sensations; Plaintiff also noted increased falls and weakness since her diagnosis with multiple sclerosis in January 2014. R. at 626.

An examination revealed she was not able to walk more than two feet without becoming unsteady. R. at 629. Plaintiff was also unable to stand on one leg and needed support while standing. Id. She was diagnosed with multiple sclerosis, chronic pain, a migraine, abnormal involuntary movements, limb pain, backache, and lack of coordination. R. at 623. After being administered a steroid, she was discharged on May 15, 2014. R. at 625. She was further prescribed medication including hydrocodone and was told to follow-up with Dr. Kendra Drake

within five days of discharge. Id. On May 27, 2014, plaintiff was seen at Tucson Medical Center complaining of headache, back pain, and constipation. R. at 742. This was seen as an exacerbation of her multiple sclerosis. Id. Plaintiff was told to follow-up with a specialist and was diagnosed with a headache without neurologic deficits and generalized back pain. Id. An x-ray of the abdomen revealed no dilated loops of the small bowel or air fluid levels that would suggest small bowel obstruction. R. at 745. Plaintiff was given baclofen for her spasms and magnesium sulfate for constipation. R. at 746. She was told to follow-up with her primary care physician and discharged to home. Id.

On June 1, 2014, Plaintiff was seen at Tucson Medical Center where she complained of general aches and itching. R. at 747. She stated that she had leg pain for more than two months, itching for a month, and nausea and vomiting episodes. Id. She complained of "her body temp 'get[ting] hot' in certain spots since last night." Id. Other symptoms included abdominal pain. Id. Plaintiff was found to have experienced uncontrolled twitches since her diagnosis. R. at 748. Her chart indicated noncompliance with the medications she had been prescribed, refusal to learn about the disease process, and failure to follow-up with specialists. R. at 753. Plaintiff was administered pain medication, did not appear to be in any distress, and was only awoken by her mother to request more pain medication. Id. Plaintiff declined all care management offered by the hospital. R. at 754. She did not present any neurological changes and was recommended for outpatient follow-up. Id. Plaintiff was discharged from the hospital in no distress and ambulating on her own. Id. Her diagnosis was multiple sclerosis and chronic pain. Id.

On June 17, 2014, Plaintiff visited Banner University Medical Center complaining of issues with chronic pain and multiple sclerosis management. R. at 776. Plaintiff had not visited a neurologist since her diagnosis and was not on any medications for her diagnosis. Id. She

reported balance disturbance and vertigo since October 2013. Id. No weakness was reported, but Plaintiff did indicate significant lightheadedness in the mornings and subjectively weak and painful legs, back pain, frequent nausea and stomach pain. Id. Plaintiff had frequent headaches and MS flares that were severe and worsening; she also suffered from issues of constipation. Id. Plaintiff also indicated some vision spotting. R. at 777. A neurological exam revealed plaintiff to be oriented and able to follow commands. R. at 778. She was also found to have normal motor skills and sensory responses. Id. The doctors recommended subcutaneous interferon treatment which the plaintiff accepted. Id.

It was not clear whether Plaintiff had a relapsing/remitting disease or a primary progressive disease. Id. Plaintiff was to have a new brain MRI done within six months or with the next MS flare and was given Phenergan for nausea.  Id. She was also referred to pain management for her back pain. Id. On June 23, 2014, Plaintiff was seen at El Rio Community Health Center after complaining of abdominal discomfort. R. at 643. She noted chronic muscle spasms, reactive depression, hypothyroid, and balance impairment. Id. All of these started on January 24, 2014. Id. The Clinic referred Plaintiff to a gastroenterologist and gave her medication for nausea. R. at 645.

On July 16, 2014, Plaintiff was seen in the Emergency Department of Banner University Medical Center. R. at 779. She complained of leg pain, back pain, and abdominal pain. Id. She also noted vomiting that was ongoing for about a month and a headache for about a week. Id. Plaintiff also complained that she had intermittent trouble with urination and felt that her legs were tingling. Id. Plaintiff also noted spots in her vision since her diagnosis. R. at 782. Her vital signs were normal, but a physical exam revealed weakness in her left leg, decreased sensation in legs, course motor control of the left leg, and diffuse abdominal pain. R. at 780. Neurology

recommended a head and spine MRI, but due to the plaintiff's pain only a head and C-spine MRI were taken. *Id.* She was given pain medication to alleviate the symptoms. Id. The MRI revealed active lesions in the brain, but no significant new neurological deficits. Id.   It also revealed enhancing foci in the right parieto-occipital white matter as well as the body of the right corpus callosum that was suggestive of active lesions. R. at 787. The MRI found that vertebral body height and marrow signal intensity was normal as well as cervical disc space height and signal intensity. R. at 794. It did reveal slight signal heterogeneity on T2 slices, but no definite demyelinating disease was evident. Id.

A brain MRI revealed flair hypertintensities throughout the brain bilaterally, most prominently in the periventricular white matter and corpus callosum. R. at 795. These also appeared in the subcortical white matter in the superior bilateral parietal lobes and the bilateral basal ganglia. Id. The scan also revealed enhancing lesions in the subcortical white matter of the right parieto-occiptal lobe and body of the right corpus callosum. Id. All other structures and areas were normal in appearance. Id. Plaintiff was advised to take gabapentin and betaceron for her symptoms. R. at 780. The final diagnosis was of a headache and abdominal pain and Plaintiff was found to have no emergent medical condition. Id. Neurology refused to rule out epidural abscess, spinal cord compression, or vertebral fractures. R. at 787. Plaintiff was discharged and would complete an MRI at a later date. R. at 780.

On August 12, 2014, Plaintiff was seen at Banner University Medical Center. R. at 771. She complained of back pain, leg pain, and a headache and she was not currently taking any medication for her MS. R. at 800. An MRI of the brain revealed multiple T2 hyperintense white matter lesions that affected the periventricular areas, cerebellum, and ventral pons. R. at 773. Other T2 enhancing white matter lesions were also found in the C and T spine MRIs. Id. It was

unclear from the plaintiff's history or MRIs whether she had a relapsing/remitting disease or a primary progressive disease. Id. Plaintiff was referred to neurology and told to make a follow-up appointment. Id. She was prescribed Tylenol for back pain and referred to a pain clinic and behavioral health for follow-up. Id.

On September 7, 2014, Plaintiff was seen at Northwest Medical Center complaining of headache, mid-back pain, and vomiting. R. at 1217. She was given a prescription for antiemetic and referred to a clinic. R. at 1219. She was discharged with a diagnosis of headache and nausea; her neurological exam was normal. Id. She was also prescribed ibuprofen and metoclopramide. R. at 814. On September 9, 2014, Plaintiff visited St. Joseph's Hospital complaining of right anterior knee pain. R. at 875. This pain occurred subsequent to a fall; Plaintiff also complained of a headache. Id. An x-ray of the right knee appeared normal and revealed no fracture. R. at 877. Plaintiff was given Toradol, crutches, and a prescription for naproxen and discharged with instructions to ice, rest, and elevate the knee. Id. She was diagnosed with a right knee contusion. R. at 878.

On March 17, 2015, Plaintiff visited East Side Health Center for a follow-up visit. R. at 1017. She visited to establish care due to MS and being wheelchair bound. Id. Her chief complaints were pronounced lower back pain, hip, and coccygeal pain. Id. She was screened for depression via the PHQ9 and scored a 15. Id. Plaintiff was prescribed baclofen, peri-colace, and tramadol. R. at 1021. She was advised to come back for a follow-up visit in two months. Id.

On April 7, 2015, Plaintiff visited Carondelet Health Network with pain in her head and neck after a fall in the shower. R. at 868. A head CT showed no significant intracranial abnormalities. R. at 869. It also showed no evidence of hemorrhage, mass, or acute infarction. R. at 873. There were no significant abnormalities or fractures of the cervical spine shown by a

cervical spine x-ray. R. at 869, 874. She was diagnosed with a head injury and cervical strain and discharged. R. at 870.

Plaintiff visited the Center for Neurosciences on May 19, 2015, to be seen regarding her multiple sclerosis. R. at 1049. An examination noted that her disease had progressed and MRIs of the cervical and thoracic spine were ordered to look for active lesions. R. at 1051. A follow-up was ordered after the scans. Id. She was also to start Ativan tablets. R. at 1054. Plaintiff was found to have significant dysmetria, more on the left than on the right. R. at 1057. On May 21, 2015, plaintiff was admitted to St. Mary's Hospital for MS exacerbation and chronic pain syndrome. R. at 816. At the emergency room, Plaintiff was seen for a fall that caused lower extremity weakness. R. at 819. The fall caused Plaintiff to lose consciousness and caused blood to come out of her ear. Id. Plaintiff was also unable to use the walker she had or get up to a standing level on her own. Id. The only physical issue on examination was an eschar in the left ear canal. R. at 820. She was unable to raise her leg off of the bed for more than two seconds or to do it with resistance. Id. She was discharged on May 27, 2015. R. at 816. During her stay, she was treated with parenteral Solu-Medrol and given a brain and spine MRI. Id. She was found to have the ability to manage on her own at home and advised to follow-up with her primary care physician. R. at 817. At the time of discharge, she was alert and oriented and only had some constipation issues. Id.

On June 4, 2015, Plaintiff visited Center for Neurosciences for a follow-up on her multiple sclerosis. R. at 1045. She was found to be very ataxic with trouble walking. Id. She was prescribed Tysabri. Id. She was found to be JC-virus negative. Id. On June 16, 2015, Plaintiff visited East Side Health Center for a follow-up visit. R. at 1010. She had a previous hospital visit due to a fall and complained of a rash on her torso and arms. Id. Plaintiff was prescribed a

wheelchair, sock aid, metal reacher, bathtub safety rail, commode bedside, bath/shower seat, toilet seat elevator, foam chair cushion, and a step n rest walker. R. at 1015. She was also referred to dermatology and asked to follow-up within one month. R. at 1016.

On July 3, 2015, Plaintiff was admitted to St. Mary's Carondelet. R. at 1136. She was diagnosed with multiple sclerosis and blurred vision. Id. She was to follow-up with her health clinic and neurologist within one week. Id. While admitted she complained of blood coming out of her ears since her fall in May 2015. R. at 1138. She was also given diazepam for insomnia. R. at 1139. A neurology consult revealed multiple sclerosis with neuromyelitis optica that was very atypical. R. at 1146. They recommended tysabri. Id. She was prescribed solumedrol and discharged on July 6, 2015. R. at 1136. On July 7, 2015, Plaintiff went to the Center for Neurosciences complaining of an exacerbation of MS symptoms that had led to her hospitalization. R. at 1042. She was found to have abnormal pattern reversal visual evoked responses compatible with bilateral optic neuritis. Id. On July 9, 2015, Plaintiff visited Arizona Oncology for a referral. R. at 1040. She was examined and shown to have weakness of the lower extremities, ataxia, and inability to ambulate and her MS was found to be aggressive with a relapsing/remitting presentation. R. at 1041. She was prescribed natalizumab and was to follow up in four weeks. Id.

On July 10, 2015, Plaintiff went to Tucson Medical Center Emergency Department complaining of chest pain. Id. A chest x-ray revealed no infiltrates, pleural effusion, or pneumothorax. R. at 892. There was no evidence of active cardiopulmonary disease. Id. She was discharged to home with a prescription for oxycodone. R. at 894. On July 20, 2015, Plaintiff visited Tucson Medical Center complaining of cardiac chest pain. R. at 895. She also complained of back pain, neck pain, and blurred vision. Id. She was admitted to the hospital for a neurology

consultation and MRI. R. at 900. Plaintiff was also given pain medication. Id. An EKG revealed

no acute findings. Id. A neurology consult revealed possible MS exacerbation. R. at 910. A chest

x-ray revealed no pneumothorax, pleural fluid, and osseous lesions. R. at 936. Her chest pain

lessened while admitted on July 22, 2015. R. at 913.  There was a suspicion of left-sided optic

neuritis based on clinical history that was treated with IV solumedrol. R. at 916.

On July 22, 2015, she was given a brain MRI without contrast that found multifocal

signal changes in the cerebral white matter that was consistent with plaintiff's multiple sclerosis.

R. at 938. Compared to a previous MRI taken on May 11, 2014, the signal changes had

increased, especially along the brachium pontis and periventricular parietal and occipital white

matter. Id. There were also signal changes in the partially visualized upper cervical cord. Id. She

was discharged on July 25, 2015 in stable condition. R. at 927. She was prescribed

methocarbamol and oxycodone. R. at 928. On July 28, 2015, plaintiff was seen at Center for

Neurosciences. R. at 1038. This was a follow-up visit after Plaintiff's first infusion of Tysabri.

Id. She complained of all over pain and chest pain. Id. She was found to be stable and prescribed

Cymbalta. R. at 1038-39.

### 3.  Medical Reports/Opinions

#### a.  *Disability Determination for Childhood SSI Benefits*

On March 27, 2006, Thomas E. Staats, Ph.D. reviewed Plaintiff's records and completed

a mental status examination. R. at 487. Dr. Staats observed that Plaintiff did not suffer from

separation anxiety at the beginning of the examination. R. at 489. Dr. Staats found that Plaintiff

could follow directions adequately and was only mildly overactive. Id. Analysis of a drawing

task performed by Plaintiff suggested possible psychosis and/or perceptual-motor problems. Id.

Dr. Staats observed that Plaintiff was only marginally appropriate throughout the interview, she

never smiled, and she only made fleeting eye contact. Id. Dr. Staats reported that Plaintiff expressed anxiety when reading aloud or being taunted by her classmates and Plaintiff expressed feeling ridiculed and rejected by her peers. Id.

Dr. Staats reported that Plaintiff "was able to interact in a somewhat immature manner and exhibited marginal social judgment. She demonstrated below-age adaptive behaviors." R. at 490. Dr. Staats concluded that Plaintiff has adequate communication abilities, adequate gross motor abilities, marginal fine motor abilities, marginal to poor social abilities, poor concentration, poor persistence, a low-average cognition, and her personal/behavioral patterns are somewhat below age. Id. Dr. Staats clinical impression of Plaintiff was that she has provisional depressive disorder NOS with psychotic features, a learning disorder NOS by history, and that anxiety disorder NOS and delusional disorder NOS would need further examination to rule out. Id.

### b. *Disability Redetermination at Plaintiff's Eighteenth Birthday*

Between March 22, 2013 and August 8, 2013, several providers were asked by Louisiana's Department of Disability Services to conduct examinations of Plaintiff in order to redetermine her disability. R. at 593-621. Each of these providers responded that they had been unable to gather sufficient evidence because of the Plaintiff missing her exams. Id. Therefore determination was made based on the previous examination which was insufficient to support the continuation of Plaintiff's disability.

### c. *Disability Determination at the Initial Reconsideration Level*

On March 25, 2013, a Psychiatric Review Technique was completed. Id. at 577. Jack Spurrier, Ed.D. noted that there is insufficient evidence to determine a medical disposition. Mr. Spurrier noted that there was a medically determinable impairment that is present but does not

21

satisfy the diagnostic criteria: learning disorder. Id. at 578. Mr. Spurrier also noted that depression is noted but does not precisely satisfy the diagnostic criteria. Id. at 580. Mr. Spurrier noted that there was insufficient evidence to determine the function limitations of "restriction of activities of daily living," "difficulties in maintaining social functioning," and "difficulties in maintaining concentration, persistence, or pace." Id. at 587. Mr. Spurrier noted that there were no episodes of decompensation. Id. Mr. Spurrier noted that:

> Clmt was previously allowed by ALJ. Prior CE dated 3/27/06 shows clmt had dxf provisional depression & LD by history.
> She currently alleges learning d/o & dyslexia. Clmt did not return her ADLs, but there are 3rd adls in file. 3rd says clmt can't read & has dyslexia. However, she's able to drive, shop, handle finances, cook & do chores.
> All MER in file is in regards to physical complaints. Any mental observations were nml.
> Clmt was scheduled for a MSE 3/9/13 but called to reschedule b/c she was going out of town w/ her brother to visit his kids. The MSE was rescheduled for 3/21/13. 3rd called & said said they had 2 flat tires & couldn't keep the MSE. Due to clmt's failure to attend CEs, there is IE to adjudicate the case.

R. at 589.

On August 8, 2013, Dr. Johnny Craig completed a medical evaluation. R. at 599. Dr. Craig noted "MER Reviewed. Affirm previous assessment of physical NS." Id.

On August 8, 2013, Dr. Lynette Causey completed a Psychiatric Review Technique. Id. at 602. Dr. Causey noted that there was insufficient evidence to establish a medical disposition. Id. Dr. Causey further stated that Plaintiff's history of a learning disorder which is a medical determinable impairment is present that does not precisely satisfy the diagnostic criteria. Dr. Causey noted that there was insufficient evidence to determine whether there was a "restriction of activities of daily living," "difficulties in maintaining social functioning," "difficulties in maintaining concentration, persistence, or pace," nor "episodes of decompensation." Id. at 612. Dr. Causey noted:

> Advisory
> Allowed as child in 2007—staats exam-LD+depression
> At CDR review-did not return ADL form, did not keep two exams
> At reconsideration-failed to respond to call in letter to determine if she would keep rescheduled exam
> No new psychiatric sources
> Insufficient evidence

R. at 614.

After the ALJ hearing on June 26, 2014, Plaintiff was seen by agency reviewer Jerome Rothbaum, M.D. on July 16, 2014. Dr. Rothbaum reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. R. at 708. Reviewer Dr. Rothbaum stated the following regarding Plaintiff's physical limitations:

> I was unable to demonstrate any substantial objective evidence of the allegation of multiple sclerosis. Therefore all of the specifics of the ODAR form should be considered to be without impairment. The claimant should be considered to be normal functioning with the exception of the history of learning impairment. All the other criteria of the ODAR form should be considered to be without impairment.

Id.

As noted by Plaintiff's attorney, Ms. Coleman, during the September 25, 2017 ALJ hearing, Dr. Rothbaum made only this general statement and failed to complete the remainder of the form. Suppl. R. 6-7. Therefore, there are no specific physical limitations listed for Plaintiff. R. at 708-13. Dr. Rothbaum's physical examination of Plaintiff showed normal system function, normal muscular strength in the lower extremities and shoulders, normal grip strength, and the ability to ambulate without significant problem. R. at 706-07.

On July 14, 2014, agency reviewer Glenn Marks, Ph.D., reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") assessment. R. at 695. Dr. Marks found that Plaintiff does have a psychological diagnosis that has limitations lasting at least twelve months. R. at 699. Evaluation revealed some evidence of difficulty with memory though a more formal

evaluation would be necessary to determine the extent. Id. Dr. Marks reports that Plaintiff appears capable of completing routine activities that do not require multitasking. *Id.* Dr. Marks states that Plaintiff's ability to interact socially as well as to adapt to change is sufficient upon examination. R. at 700. On the Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Marks noted that Plaintiff has moderate limitations in understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions. R. at 701. Additionally, Dr. Marks noted that Plaintiff also has severe impairments in reading and writing. R. at 702. In the opinion of the reviewer, "were it not for possible memory problems and the sequelae of the multiple sclerosis, she appears capable of working in blue-collar work that does not require reading and writing. Given the other complicating factors, it is unclear whether she could even engage in those types of positions." R. at 698.

## C.    Testimonial Evidence

At the ALJ hearing held on June 26, 2014, Plaintiff testified that the last grade she had finished through public school systems was fifth but that she had been homeschooled until about eighth grade. R. at 74. Plaintiff testified that she had not earned a high school diploma and that she is unable to read, however she can complete some simple math. *Id.* Plaintiff also testified that she has no prior work experience. R. at 75. Additionally, Plaintiff explained that she was currently living with her uncle and that her mother has to help her with self-care such as bathing and dressing. *Id.* Plaintiff testified that she had missed the examinations scheduled for her previously due to a lack of transportation and notice. R. at 80.

Plaintiff further testified that she has suffered from a learning disability and depression and had been diagnosed with Multiple Sclerosis on January 7, 2014. R. at 75. Plaintiff testified

that due to her multiple sclerosis she can only walk or stand for three to five minutes at a time, she can sit all day, and lift twenty to thirty pounds. R. at 79.

At the hearing, Plaintiff testified that she was not currently seeing a doctor for her mental health, nor taking medications to treat a mental health condition. R. at 78. In regard to her multiple sclerosis, Plaintiff testified that she has been seen at El Rio—Tucson University and TMC and that she is on pain medication but has yet to be given medication to directly treat her multiple sclerosis. Id. Plaintiff also testified that she has not been given a doctor to manage her multiple sclerosis and has been seen at the emergency room a lot for nausea, vomiting, headaches, leg pain, and back pain. R. at 78-79. Plaintiff stated that this pain is sticking or throbbing and that she would rate it a nine on a scale of ten. R. at 80.

Plaintiff also testified regarding her daily activities. She stated that she helps to wash the dishes at home, she sometimes helps cook, and sometimes helps with the grocery shopping, but that she is unable to mop, sweep, or do her own laundry. R. at 76. Plaintiff stated that her hobbies include watching tv, scanning Facebook, and going to movies or watching tv with friends. R. at 76-77.

At the ALJ hearing held on March 1, 2017, Plaintiff chose to postpone and acquire an attorney. R. at 54. Testimony was taken from Dr. Irvin S. Belzer, impartial medical expert. R. at 55.  Dr. Belzer questioned Plaintiff on her weight during the time period at issue between March 1, 2013 and July 9, 2015. R. at 56. Plaintiff responded that she had lost weight in that time period. R. at 57. When asked about Plaintiff's impairments, Dr. Belzer testified that Plaintiff had an ongoing problem with obesity and that her body mass index would fall within the range of excessive obesity. R. at 58.   Additionally, Dr. Belzer spoke regarding Plaintiff's multiple sclerosis and how medical records from May 11, 2014, describe increased weakness, episodes of

falling, and noted that Plaintiff was unsteady when walking two feet. R. at 59. Dr. Belzer also made note that medical records described conditions called loud dysmentia and Babinskis, both of which point to significant neurological disease. Id.

In addition to discussing medical records from May 11, 2014, Dr. Belzer also testified as to his opinion of the medical records from January 2014 when Plaintiff was diagnosed with multiple sclerosis. Id. Dr. Belzer noted the MRI of the brain, cervical spine, and thoracic spine which all revealed lesions consistent with multiple sclerosis. R. at 59-60. In recap, Dr. Belzer acknowledged that Plaintiff has had significant abnormal findings, significant findings on physical examination, and significant findings on the MRI scan.

Dr. Belzer also referred the ALJ to the emergency room report from November 15, 2013 which stated that the Plaintiff had fallen four times in the previous two months. R. at 60. Additional falls were referenced as having occurred on December 5, 2013; September 9, 2014; April 7, 2015; September 12, 2015; and December 8, 2017 allowing Dr. Belzer to point out that these falls occurred while Plaintiff was being treated for her multiple sclerosis. Id.

When asked by the ALJ if Plaintiff meets or equals a listing, Dr. Belzer responded that as of January 2014, the Plaintiff meets an 11.09A listing. R. at 62. Referring back to only the time period between when the Plaintiff was deemed not to be disabled until January 2014, Dr. Belzer opined that Plaintiff would not have any work related restrictions outside of her weight. R. at 63-64. Dr. Belzer stated that during that period he would have suggested that Plaintiff could lift up to fifty pounds on occasion, up to twenty frequently, there would not be any restrictions with sitting, and she could stand and walk up to six hours. R. at 64.

Additionally, there are no restrictions in the use of Plaintiff's arms and hands, use of foot controls would be restricted to frequently as opposed to constantly or continuously, Plaintiff

26

could climb stairs and ramps occasionally, but would not be able to climb ladders and scaffolds. R. at 65. Dr. Belzer continued by saying that the Plaintiff would be limited to only occasional balancing, stooping, kneeling, crouching, and crawling as well as only occasional exposure to unprotected heights, moving mechanical parts and operation of a motor vehicle. *Id.* The ALJ clarified that Dr. Belzer's opinion does not take into account any dyslexia or illiteracy that the Plaintiff suffers however his testimony does support that Plaintiff was disabled as of January 24, 2014. R. at 65-66.

At the ALJ hearing held on September 25, 2017, Plaintiff testified that she is currently 23 years old and living with her uncle; she was previously living with her mother and before that a boyfriend. Suppl. R. at 9-10. Plaintiff stated that her only current income is from Social Security and that she last drove in either 2015 or 2016. Suppl. R. at 10. Plaintiff again testified that she has zero prior work experience. Suppl. R. at 11.

Plaintiff further testified that she is unable to walk on her own and must use either crutches or a wheelchair to get around. Suppl. R. at 12. She stated that she has been using a wheelchair since February 2014, at all times unless it was broken, which is why she's currently using crutches. Suppl. R. at 12-13. Plaintiff testified that she has experienced various side effects from the medications she's on including constipation, an irregular heartbeat, and difficulty breathing. Suppl. R. at 15. Plaintiff was prescribed various pain medications and she testified that none of them provided relief of her symptoms. Suppl. R. at 16. Additionally, Plaintiff testified that she was given morphine and had a reaction to it in that it would make her angry for no reason and that the doctors wouldn't listen when she said she didn't want to take it. Suppl. R. at 16-17. In conjunction with her multiple sclerosis, Plaintiff testified that she was seeing flashing lights, "shooters", in her vision. Suppl. R. at 18. In addition to pharmaceutical medications,

Plaintiff was also prescribed medical marijuana which she testified allowed her to eat and rest more easily. Suppl. R. at 20. Plaintiff testified that between March 2013 and July 2015, she experienced bladder and bowel incontinence as well as dizzy spells in which she worried she would pass out. Suppl. R. at 21.

Plaintiff expressed in her testimony that she began experiencing headaches mid 2013 which would be preceded by the "shooters" preventing her from being able to open her eyes. Suppl. R. at 22. Plaintiff added that once these headaches had become migraines that she couldn't stand the smell of anything. Id. Plaintiff testified that when she sought treatment for these headaches she was told that they were because of an ear infection and to just take an over-the-counter headache medication. Suppl. R. at 22-23. Plaintiff testified that these medications would provide some relief after an hour or so but the relief didn't last long and the headaches never really went away. Suppl. R. at 23. Additionally, Plaintiff testified that she was diagnosed with dyslexia that had caused her to switch from public schooling to homeschool. Suppl. R. at 25. Between 2013 and 2015, Plaintiff testified that she was still having difficulty reading and that she could no longer write due to tremors in her hands. Id.

Plaintiff additionally testified that both her weight and hot weather impact her impairments by causing her body to swell and fatigue to be more prominent. Suppl. R. at 26. Plaintiff also testified that during the time period in question, she was having trouble understanding things, remembering things, and applying information. Suppl. R. at 28. Finally, Plaintiff testified regarding the effects of depression on her life. Suppl. R. at 26. Plaintiff explained that her depression impacted her appetite, causing her to either not have any desire to eat or to become sick when she did attempt to eat. Suppl. R. at 27. Plaintiff also explained that her depression made her not want to leave her bed or do anything, that she had trouble

concentrating and thinking, she didn't sleep much, felt guilt and worthlessness, and lost interest in things she used to enjoy. Id.

At the hearing, Plaintiff testified that during the time in question between March 2013 and July 2015, she was being treated for multiple sclerosis and doing what doctors were telling her in regard to an intravenous treatment, steroids, and pain medications. Suppl. R. at 14. Plaintiff testified that she was also seeing a natural physician in addition to traditional treatment and that she was hospitalized several times since 2014. Suppl. R. at 15. During this period of treatment, Plaintiff was diagnosed with ataxia and she testified that she would be sitting but her arms or legs would move by themselves and she couldn't stop them. Suppl. R. at 19. Plaintiff testified that prior to being diagnosed with multiple sclerosis in January 2014, that she was falling, shaking, having bad headaches, and frequent ear infections. Id. In response to these complaints, Plaintiff testified that she was told it was vertigo or an inner ear infection. Suppl. R. at 20. Plaintiff testified that because of her repeated falls that she sustained other injuries during this time period including a fractured wrist, bruised ribs, and concussions. Id.

Plaintiff also testified that she had been involved in a car accident in 2012 in which she received bruised ribs and a bruised leg. Suppl. R. at 21. When asked about whether her right knee still bothers her from the accident, Plaintiff testified that sometimes it hurts, but that both of her legs hurt and swell up and she's not sure if it's related to the car accident or her multiple sclerosis. Suppl. R. at 24. Plaintiff described this leg pain as tingling, numb, and aching, starting from her hips and radiating down to her feet. Id. Plaintiff also testified that she suffers and had suffered during the time period in question from back pain when she sits and when she walks and that her back and shoulders frequently spasm. Suppl. R. at 24-25. Plaintiff testified that her

thyroid condition would cause her weight to fluctuate up and down and that the changes would make her legs hurt and swell up. Suppl. R. at 28.

Plaintiff also testified regarding her daily activities between March 2013 and July 2015. She stated that she was not able to do any cooking because while she was able to operate the microwave, she was unable to carry anything around for fear of dropping it. Suppl. R. at 29. Plaintiff also testified that she was unable to clean or shop. Id. During this time, Plaintiff stated that she could only stand for two to three minutes before her legs would shake and she couldn't take a step. Suppl. R. at 29-30. When sitting, Plaintiff expressed that her feet would swell so she needed to get up and move. Suppl. R. at 30. Plaintiff testified that she began using the wheelchair in February 2014. Id. Plaintiff also testified that while she had no problems with lifting things that her hands would shake and there was a chance that she would drop what she was trying to lift. Id. Plaintiff added that she was able to push and pull but not if it required her to hold onto something. Id. Plaintiff testified that she was unable to any bending, kneeling, or squatting and that while she could reach for things overhead that once again her grip was an issue. Suppl. R. at 30-31.

After taking Plaintiff's testimony, Plaintiff's mother, Inez Fuller, was also questioned. Suppl. R. at 31.  Ms. Fuller testified that Plaintiff lacked the ability to balance herself during the time period at issue and would often fall. Suppl. R. at 32. Ms. Fuller explained that they had to make Plaintiff a homemade shower chair around April or May of 2013, because she was falling too frequently and that Plaintiff can no longer comb her own hair because of her hands trembling. Id. Ms. Fuller also explained that she knew Plaintiff was having mobility issues when she would go to sit down and would be laid over instead of upright, and then had to use her hands to push her body up instead of being able to stand using just her legs. Suppl. R. at 34. Ms.

Fuller further testified that she witnessed Plaintiff's memory lapses begin and gave the example of the time that Plaintiff was trying to recall when her grandfather passed and when she couldn't recall the date she became frustrated and started crying. Suppl. R. at 36. Ms. Fuller spoke of Plaintiff's dyslexia explaining that during the time period in question they had been at a testing facility for Plaintiff's dyslexia when she had fallen and therefore had not finished the testing. Suppl. R. at 41. However, Ms. Fuller testified that the testing completed revealed that Plaintiff was reading at a 2.4 reading level. Id.

### D. Vocational Evidence

Also testifying at the hearing was Beverly Majors, a vocational expert.  Ms. Majors characterized Plaintiff's past work as non-existent outside of the home.  With regards to Plaintiff's ability to work, Ms. Majors gave the following responses to the ALJ's hypothetical:

> Q:    If we had someone the claimant's age, education, and work experience, assume she can only lift and carry 10 pounds occasionally, five pounds frequently; stand and walk for a total of maybe two hours in an eight-hour day; sit for six; and again, she could do no complex work; and required only occasional interaction with the general public, which she's more comfortable working with things rather than people. Would there be jobs?

> A:    With those limitations, and no others, an individual would be able to work as a hand packager. Sedentary, SVP of 2. DOT number 521.687-086. For the United States, 12,300. A person could work as a sedentary assembler. Sedentary, SVP of 2. DOT number 734.687-018. For the United States, 25,200.

> Q:    Well, all right. If Ms. Scott had weakness in the legs, which might preclude her from getting to work, maybe not every day, but four or five days in a month, would there be any work she could do?

> A:    No, sir. If a person had to miss that much work, an employer would not be able to keep them on, so there would be no jobs.

R. at 43-44.

Plaintiff's attorney then questioned Ms. Majors incorporating the ALJ's first hypothetical and adding the following:

> Q:   Ms. Majors, if we assume the same hypothetical person in the first hypothetical, and adding the restriction that the hypothetical person would require the need to take more than the usual and customary breaks because of pain or symptoms of MS, would any jobs be available?
>
> A:   If a person had to take more breaks. And I don't know how long of a break you're talking about, but if it's more than a few minutes, you know, to just get up, get a drink of water. So do you want to say how long?
>
> Q:   Okay. Well at least, you know, additional – as I understand it, the standard and customary are the two 15 minutes –
>
> A:   15 minutes.
>
> Q:   Yeah. So additional –
>
> A:   Okay.
>
> Q:   -- 15 minute breaks during the day.
>
> A:   Okay. A person would not be able to take additional 15 minute breaks on a regular basis. And there would be no jobs.

R. at 44-45.

Finally, Plaintiff's attorney questioned Ms. Majors incorporating the ALJ's hypothetical regarding Plaintiff's other symptoms related to multiple sclerosis.

> Q:   Okay. And the last question. If the hypothetical individual lacked bimanual dexterity, or the ability to use both hands on any type of occasional or frequent basis because of hand tremors caused by multiple sclerosis, in your opinion would those jobs be available? Still available?
>
> A:   You have to say in reaching, handling, fingering and feeling. And it has to be in something that is constant, frequent –
>
> Q:   Yeah. Basically I said – she wouldn't be able to constantly or – I mean, excuse me. She wouldn't be able to occasionally or frequently handle – I use the word like have bimanual dexterity on a frequent or occasional basis. But if I need to say wouldn't be able to handle, finger or –

32

A:     Okay. So less than occasional?

Q:     Yes.

A:     Okay. Reaching, handling, and fingering are all frequent for the hand packaging, so that one would not be available. Hold on just a second. Reaching, handling, and fingering is constant in the sedentary assembler job. So neither one of those jobs would work. And really for sedentary, unskilled work, except for that one job as a surveillance monitor, it's required that a person be able to have reading and language – reasoning and language skills at almost the ninth grade level. So that one didn't work either. But almost all other sedentary, unskilled jobs would require that a person be able to use their hands more than occasional.

R. at 46-48).

## E.    Report of Contact Forms or Disability Reports

On December 7, 2012, a Disability Report was completed. Plaintiff alleged that she is a slow learner and suffers from dyslexia and has never worked prior to the evaluation. Plaintiff noted that she had no future appointments related to her impairments. R. at 333.

On an unknown date, a Disability Report-Appeal was completed. Plaintiff alleged that since her last disability report, she has seen a doctor for her impairments that limit her ability to work. Id. at 344. Plaintiff noted that she saw Dr. Robert Rougeau in September 2012 for pain in her right knee. Plaintiff noted that she has not seen a doctor since her last disability report for emotional or mental problems. Plaintiff stated that she takes advil for her knee pain. Id. Plaintiff noted (presumably her mother) that "her illness is that she can't read or spelling which cause her to feel asham when around people her age withdraeon from others." Id. Plaintiff also noted that "she has a hard time standing for long periods of time because of the knee injury and can't work long distance." Id. Plaintiff also noted:

Need reading help and classes so that one day she can get her GED. Would need vocrehabilitation. Not started. Not been offted to her. I call rehabilitational to get help for with know response. Precious live on her won, but she still needs help with her reading and spelling. I have try to get her is some reading classes more

33

the once. She has been studying some one my computer, but this is not the help
she needs. She has been tested by the school and found that she has dyslesia.

Id. at 345.

On April 27, 2013, a Disability Report was completed. Id. at 348. There was no contact

made with the claimant. Id. at 349.

On July 28, 2014, a Disability Report-Appeal was completed. Id. at 355. Plaintiff stated

that there has been changes in her impairment since her last disability report. Plaintiff noted that

"I have lost weight but it has been due to sadness and lack of appetite. There are times that I feel

very sad, mad and hurt." Plaintiff noted that the change occurred on October 10, 2011. She also

stated that she has been injured in both knees in a car accident and also injured her neck. Plaintiff

noted that "Dyslexia prevents reading of mail, applications and other written info. Obesity adds

to the pain in my knees. Knee injuries prevent me from walking at times." Id. at 359. She stated

that she is not as mobile due to her knee injuries and she "just can't stop a very heavy sadness

that overcomes" her.  Id.  Plaintiff noted that "while in Homer, LA improvement

agencies/programs were 60 plus miles from my home. I did not have transportation. Now that I

have relocated, for good, to Tucson, AZ. I can catch the bus to a lot of the agencies/programs as

well as get rides with my mother. Also I have more opportunities to see doctors and specialists

for my knees, depression/sadness, body pain, weight and dyslexia." Id. at 359.

On May 2, 2017, a Report of Contact was completed. Id. at 460. The Report states:

Called Claimant to inquire about pending hearing. Claimant recently moved to
another state and wishes to have an in-person hearing at her location. Telephonic
and VTC options were discussed with Claimant, however she maintained she
wants her case transferred in order to have an in-person hearing. Advised claimant
that once case is transferred it is up to the owning ODAR to schedule as per their
availability. Per ALJ if claimant demands in-person hearing it is okay to transfer
case to her jurisdiction of Alexandria, Louisiana. Verified Claimant contact
information.

Id. at 460.

On March 22, 2013, Dr. Jeffrey Faludi determined that Plaintiff's sprained ankle was not severe. Id. at 576.

## IV.     THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006. The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s. If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s. If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can

make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011. If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant attained age 18 on September 23, 2012 and was eligible for supplemental security income benefits as a child for the month preceding the month in which she attained age 18. The claimant was notified that she was found no longer disable as of March 1, 2013, based on a redetermination of disability under the rules for adults who file new applications.
2. Since March 1, 2013, the claimant has had the following severe impairments: depressive disorder, learning disorder and multiple sclerosis (20 CFR 416.920(c)).
3. Since March 1, 2013, the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926.
4. After careful consideration of the entire record, the undersigned finds that since March 1, 2013, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) she is limited to lifting and carrying 5 pounds frequently and 10 pounds occasionally, stand and walk for 2 hours of an 8-hour workday. Further, due to mental and emotional no complex work, only occasional interaction with the general public, where she is more comfortable working with things rather than people.
5. The claimant has not past relevant work (20 CFR 416.965.
6. The claimant was born on September 24 ,1994 and is a younger individual age 18-44 (20 CFR 416.963.
7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964.
8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968.
9. Since March 1, 2013, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a).

10.    The claimant's disability ended on March 1, 2013, claimant's disability ended on March 1, 2013, and the claimant was not disabled from March 1, 2013 to July 9, 2015 (20 CFR 416.987(e) and 416.920(g).

R. at 10-21).

## VI.    <u>DISCUSSION</u>

### A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987)).

**B.      Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the ALJ's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

> 1.      The ALJ erred by not complying with the Remand Order;
>
> 2.      The ALJ failed to properly inform Plaintiff of her right to counsel;
>
> 3.      The Plaintiff was not adequately represented by counsel;
>
> 4.      The Agency did not perform the redetermination in a timely manner;
>
> 5.      The ALJ failed to develop the Record; and,
>
> 6.      The ALJ's decision was not based on substantial evidence.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), ECF No. 35). Plaintiff asks the Court to remand the case to the Commissioner with instructions to issue a new decision based on substantial evidence and proper legal standards. Id.

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." Def.'s Mot., ECF No. 58. Specifically, Defendant alleges that:

> 1.   The ALJ properly complied with the Remand Order;
>
> 2.   The ALJ explained Plaintiff's ability to seek counsel;
>
> 3.   Plaintiff cannot not seek an ineffective assistance of counsel claim in this complaint;
>
> 4.   The Agency performed the redetermination in a timely manner;
>
> 5.   The ALJ adequately developed the Record; and,
>
> 6.   The ALJ's decision was supported by substantial evidence.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br."), ECF No. 59).

**C.      Analysis of the Administrative Law Judge's Decision**

**1.  Did the ALJ comply with the Appeals Council Remand Order?**

Plaintiff first alleges that the ALJ did not comply with the Remand Order entered on May 16, 2016. Specifically, Plaintiff states that 1) the ALJ improperly re-determined Plaintiff's residual functional capacity; 2) no treating or non-treating source opinions were considered nor given weight by the ALJ; and 3) the ALJ failed to obtain supplement evidence from a vocational officer as to clarify the effects of the assessed limitations.

The Government argued that the Appeals Council instructed the ALJ to consider the new evidence of Plaintiff's multiple sclerosis, make a new RFC finding, weigh the medical opinions, and obtain new vocational expert testimony, if needed. The Government argued that the ALJ properly complied with these instructions.

The Appeals Council Remand Order stated as follows:

Upon remand the Administrative Law Judge will:

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Rule 96-8p. In so doing, evaluate the treating and nontreating source opinions pursuant to the provisions of 20 CFR 416.927 and Social Security Rules 96-2p and 96-5p and nonexamining source opinions in accordance with the provisions of 20 CFR 416.927(e) and Social Security Rule 96-6p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the treating and nontreating sources to provide additional evidence and/or further clarification of the opinions and medical source statement about what the claimant could still do despite the impairments through July 9, 2015 (20 CFR 416.912 and 416.920b. The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's treating sources.
- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rule 83-14. The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. As warranted, the Administrative Law Judge will ask the vocational expert to identify and resolve any conflicts between the occupational evidence provided by the

vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Rule 00-4p.

R. at 101-02.

This Remand Order was based on medical records provided by Banner University Medical Center which demonstrated that Plaintiff had a decreased sensation on her bilateral legs and an MRI which showed evidence of multiple sclerosis dating back to January 8, 2014. The medical records show that Plaintiff's complaints of balance problems, bilateral leg weakness, numbness, tingling and paint and that consideration of the multiple sclerosis are warranted. Although Plaintiff's claim stated that the ALJ did not comply with the Remand Order, the undersigned is reviewing Plaintiff's claim to also argue that the ALJ's opinion and decision were not supported by substantial evidence.

i.   **Did the ALJ give further consideration to claimant's maximum residual functional capacity during the period at issue? Did the ALJ evaluate the treating and nontreating source opinions and adequately explain the weight given to each. Did the ALJ obtain supplemental evidence from a vocational expert? If not, was it warranted?**

A residual functional capacity "is the most [an individual] can still do despite [their] limitations." The ALJ will assess the claimant's residual functional capacity "based on all the relevant evidence" presented in the case record. When assessing an individual's RFC, the goal is determine the individual's ability to meet the physical, mental, sensory, and other requirements of work.

(b) *Physical abilities.* When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work.

40

(c) *Mental abilities.* When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

(d) *Other abilities affected by impairment(s.* Some medically determinable impairment(s), such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions, may cause limitations and restrictions which affect other work-related abilities. If you have this type of impairment(s), we consider any resulting limitations and restrictions which may reduce your ability to do past work and other work in deciding your residual functional capacity.

(e) *Total limiting effects.* When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of subpart P of part 404 of this chapter, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone; e.g., someone with a low back disorder may be fully capable of the physical demands consistent with those of sustained medium work activity, but another person with the same disorder, because of pain, may not be capable of more than the physical demands consistent with those of light work activity on a sustained basis. In assessing the total limiting effects of your impairment(s) and any related symptoms, we will consider all of the medical and nonmedical evidence, including the information described in § 416.929(c).

In assessing an RFC, the ALJ will consider all relevant medical evidence as well as other evidence. The social security administration will develop the claimant's complete medical history and arrange consultative examination to help determine an individual's RFC. Statements made by an individual about an individual's abilities will be considered in the RFC determination, in addition to descriptions and observations about an individual's limitations resulting from the symptoms provided by the claimant, family, neighbors, and friends. When an individual does not have any past relevant work, the same assessment completed at step five to determine whether there are any jobs that exist for the claimant to perform. When considering ability to work, the RFC is considered together with vocational background information.

The ALJ considered Plaintiff testimony about her daily abilities, including microwaving meals, her ability to pick things up and Plaintiff's inability to hold items, bend, kneel or squat. R. at 15. The ALJ also considered Plaintiff's statement that she is unable to walk on her own and has been using a wheelchair, unless its broken, since February 2014. The ALJ also noted that one of her medical notes stated that Plaintiff ambulated in July 2014 without significant problems. R. at 16. Furthermore, the ALJ reviewed the non-medical statements that were provided in the Record. R. at 16, B21E, B22E.

The ALJ also considered Plaintiff's statements regarding her condition during that time. Plaintiff stated she had side effects of constipation, irregular heartbeat, rashes, and difficulties breathing. R. at 16. She had pain in her back, legs, one of her arms and shoulders, accompanied with muscle spasms in the shoulder. Id. She had a stabbing and tingling in her shoulder which she was unable to treat with pain medication. Id. Plaintiff alleged that her multiple sclerosis caused blurred vision, and a shooting light in her eyes, and migraine headaches. Id. The ALJ noted that Plaintiff stated that her doctors would tell her that these were caused by an ear infection and would not prescribe medication for the migraines. Id. Plaintiff also alleged that she had ataxia and stated that her legs would kick, and her arms would jump without her being able to control it. Id. The ALJ also considered medical records for March 2014. Id. The notes indicate a wide-based gait, normal lower extremity strength, and some mild spasticity in the legs. Id. Dr. Rothbaum noted that she walked with a slightly broad-based gait, noted Plaintiff's hand tremor but did not note any evidence of Ataxia. Id.

The ALJ also considered Plaintiff's statement that she was originally treated for an inner ear infection, which resulted in a multiple sclerosis diagnoses on January 2014. Id. She stated that she fell, bruised her hips, suffered from a concussion, fractured her wrist, and had multiple

bruises. Id. Plaintiff also stated that she medicated with medical marijuana and that she believed her multiple sclerosis has caused her bladder and bowel accidents. Id. The ALJ considered Plaintiff's hospital stay in January 2014, in which the ALJ noted that she was assessed by a neurologist with "probable multiple sclerosis." Id. at 17. The ALJ also noted that Plaintiff saw a neurologist on March 3, 2014 for an MRI which rendered abnormal results, specifically "widespread white matter disease in the brain and cervical and thoracic spinal cords." Id.

 Plaintiff also argued that no treating or nontreating source opinions were considered nor given weight by ALJ, Lawrence T. Ragona. Plaintiff stated that she did not have a treating doctor at that time. It is important, however, that when required to give more consideration to the treating and nontreating source opinions, the ALJ gave little weight to the State agency medical examiners who determined that there was no severe physical impairment. Rather, the ALJ noted that "[c]onsidering the number of emergency room visits and hospital stays, **the undersigned finds that multiple sclerosis is severe**, based on evidenced received after these opinions were rendered . . . [and] gives little weight to the State agency medical opinions." R. at 19 (emphasis added). In fact, the ALJ completely discounted the medical opinions and evaluations of Drs. Jeffrey Faludi, Johnny B. Craig, Lynette Causey, and Jack Spurrier because each of these examiners found that Plaintiff's mental disorders were not severe nor determined Plaintiff had a physical impairment.

However, the ALJ also stated that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the **intensity, persistence and limiting effects of these symptoms are not entirely consistent** with the medical evidence and other evidence in the record for the reasons explained

in this decision. Id. at 18 (emphasis). The ALJ then went into a thorough analysis of the why the ALJ has determined this information.[1]

As far as the effects of Plaintiff's impairment on her ability to work,[2] the ALJ considered her testimony about her inability to hold items due to hand tremors and her need for an ambulatory aide. However, the ALJ countered this statement by Dr. Rothbaum's observations about Plaintiff ambulation without significant problem. R. at 16. The ALJ also considered Dr. Rothbaum's statement that Plaintiff may be exaggerating her symptoms and functioned normally, even in consideration of her diagnoses. R. at 686. For instance, Plaintiff alleged she suffers from migraines, but later reported that she had only suffered from one migraine. R. at 16. Another medical record documented Plaintiff's serious complaints of headache, tingling, and 10/10 pain, but was then seen by doctors on numerous occasions during the visit resting comfortably, manipulating her cell phone, and in no apparent distress." R. at 18, 780. The ALJ also detailed the records that Plaintiff has failed to demonstrate that her impairments are more severe than she claims because she fails to follow the treatment regimen prescribed by Plaintiff's treating physicians. The ALJ considered Plaintiff's failure to abide by treatment plans or take medications prescribed by treating physicians. For instance, Plaintiff repeatedly failed to fill her prescriptions, nor did she always take her medication when she was prescribed. The ALJ also noted that Plaintiff did not establish care with a neurologist.

Plaintiff further objects to the qualifications of Drs. Glen Marks and Jerome Rothbaum who evaluated Plaintiff. First, Plaintiff stated that Dr. Marks is not qualified to diagnose and treat multiple sclerosis. Dr. Marks' evaluation was psychological, rather than physical and did not perform any evaluation regarding multiple sclerosis. Plaintiff also stated that Dr. Rothbaum was

---

[1] Both these evaluations took place before the Appeals Council decision to remand the matter for reconsideration in light of newly presented medical records.
[2] The ALJ also discounted the effects of Plaintiff's psychological impairments.

44

not qualified to diagnose or treat multiple sclerosis. This was not his purpose; rather Dr. Rothbaum was a state agency evaluator to assist in the Commission's determination of whether Plaintiff was able to work.

Furthermore, Plaintiff objected to a particular date—July 9, 2015—which is the date upon which it was determined that Plaintiff was again disabled. Plaintiff insists that she has been disabled since January 8, 2014. A determination of disability, however, is not necessarily the same date that an individual has been diagnosed with a disease, but rather the date that the person is deemed unable to perform job duties.

Plaintiff also argued that she was unaware that she was deemed an "able body person for two years four months that was not brought about until May 2016." ECF No. 25, at 11. Plaintiff alleges that she did not have the opportunity to express her experiences during the evaluation because she did not know that this evaluation was because she was deemed an able bodied person. Plaintiff was provided with notification that she was no longer deemed disabled following Plaintiff's failure to attend a redetermination appointment. Plaintiff failed to attend this hearing and notification was provided to Plaintiff that the reason she was not re-determined as disabled is because she missed these evaluations. Then during the ALJ hearing, the ALJ clearly told Plaintiff that:

1) The Social security administration attempted to evaluate plaintiff; 2) that the ALJ is going to require more evaluations before a decision of whether she is disabled or not can be determined; 3) the evaluation is for her multiple sclerosis, psychological and learning problems; and 4) there is limited information regarding those problems and not enough to make a decision.

Plaintiff was provided with enough notice of the purpose behind the evaluation.

Plaintiff also alleged that the vocational expert, Beverly K. Majors, who testified during the September 25, 2017 ALJ hearing stated that there was no job Plaintiff could perform "now or

in the future." Further, Plaintiff states that the only mention of Ms. Majors' testimony in the first paragraph of the [date] ALJ decision. However, during the September 25, 2017 ALJ hearing Ms. Majors testified regarding available jobs given Plaintiff's RFC.

> Q: If we had someone the claimant's age, education, and work experience, assume she can only lift and carry 10 pounds occasionally, five pounds frequently; stand and walk for a total of maybe two hours in an eight-hour day; sit for six; and again, she could do not complex work; and required only occasional interaction with the general public, which she's more comfortable working with things rather than people. Would there be jobs?

R. at 1329.

Ms. Majors responded stating that there would be two: a hand packager and a sedentary assembler. Id. at 1330. The ALJ determined that if Plaintiff was required to miss work due to leg weakness approximately four to five days a month, there would be no jobs available. Id.

Plaintiff's attorney then added to the above hypothetical, adding the restriction that the hypothetical person would require the need to take more than the usual and customary breaks because of pain or symptoms of MS. Id. Ms. Majors then responded stating that an individual would not be able to take more than two 15 minute breaks on a regular basis. Id. at 1331. Plaintiff's allegation that Ms. Majors testified that there were no jobs for Plaintiff is misplaced. That was stated only after Plaintiff's attorney proposed the same hypothetical with additional limitations. The ALJ did not determine that Plaintiff's RFC would require her to take repeated breaks. Based on the ALJ's finding, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Id. at 21. All of this information was considered and examined in the ALJ's decision. Specifically, the ALJ stated:

Since March 1, 2013, if the claimant had the residual functional capacity to perform the full range of sedentary work, Medical-Vocational Rule 201.24 would direct a finding of "not disabled." However, additional limitations have impeded the claimant's ability to perform all or substantially all of the requirements of this level of work. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the Administrative Law Judge asked the vocational expert whether jobs exists in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity, since March 1, 2013. The vocational expert testified that give all of these factors the individual would be able to perform the requirements of representative occupations such as the following:

- A *hand packager*, (Dictionary of Occupational Titles (DOT) #521-687-086, sedentary, Specific Vocational Preparation (SVP) 2), with approximately 12,300 such representative jobs existing in the United States; and,

- A *sedentary assembler*, (DOT #734-687-018, sedentary, SVP 2), with approximately 25,200 such representative jobs existing in the United States.

  Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

  Based on the testimony of the vocational expert, the undersigned concludes that, since March 1, 2013, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

R. at 20-21.

The ALJ not only obtained supplemental testimony in light of the new evidence, the ALJ adequately and thoroughly discussed her testimony and conclusions throughout its January 31, 2018 decision. The ALJ considered all of the medical records and redetermined her residual functional capacity in consideration of new medical records. The undersigned **FINDS** that the requirements of the Remand Order were complied with by the ALJ. The undersigned also **FINDS** that the ALJ's decision was based on substantial evidence and Plaintiff has not demonstrated that the determination was not based on substantial evidence.

**2. Did the ALJ adequately Inform the Plaintiff of her right to counsel?**

A plaintiff does not have an absolute right to be represented by counsel during the pendency of the plaintiff's case. <u>Duggan v. Barnhart</u>, 66 F App'x 730 (9th Cir. 2003); <u>Cornett v. Astrue</u>, 261 F. App'x 644 (5th Cir. 2008); <u>Russell v. Chater</u>, 62 F.3d 1421 (8th Cir. 1995); <u>Slavin v. Commissioner</u>, 932 F.2d 598 (7th Cir. 1991. However, Plaintiff was sufficiently given the opportunity to obtain and/or consult with an attorney or non-attorney representative, prior to all three of Plaintiff's ALJ hearings.

In Plaintiff's first ALJ hearing on September 18, 2014 hearing, Plaintiff was not represented by an attorney. However, during the beginning of the hearing, the ALJ adequately explained her ability to be represented by counsel.

> ALJ: . . . Now you've come in today without an attorney, without a representative. You don't need an attorney for these proceedings, but if you would like the opportunity to talk to an attorney about your case, I will allow you to postpone your case one time only just for that purpose. Attorneys work on what's called a contingency, meaning they don't require you to pay money up front, and only collect a fee if you win the case. You might also be entitled to free legal services if you qualify for one of those programs. We do have referral numbers at which you can contact attorneys that come into our hearing rooms all the time. Do you want to take the opportunity now to do that, or do you want to proceed today without representation?
>
> CLMT: Proceed today without—

R. at 63-64.

Following the Remand Order from the Appeals Council, a second ALJ hearing was held on March 1, 2017 in which Plaintiff was not represented by an attorney nor did she have a non-attorney representative present. During this hearing, the ALJ inquired in to whether Plaintiff wanted an attorney:

> ALJ:     . . . If you would like the opportunity to talk to an attorney or to talk to an attorney about this case, I will allow you time to do that if you would like to do that. I'll postpone the case just for that purpose if that's what you'd like to do. As you know, attorneys work on what is called a contingency, meaning they don't require you to pay money up

> front, and only collect a fee if you win the case. You might also be
> entitled to free legal services if you qualify for one of those programs.
> I know you did have Legal Aid in the las hearing. I'm not sure why
> she withdrew. But in any event, if you'd like the opportunity to try to
> contact her against, that's okay with me. I'll postpone the case.
> Otherwise, we'll proceed. Would you like to proceed, or do you want
> to postpone the case?

OBS:     Postpone.

ALJ:     You want to postpone? I'll allow you to postpone. I am going to get
the testimony of the medical expert at this time because he is on the
phone and he's reviewed the file. So I'm going to go ahead and
proceed with that. But I will postpone the case with that testimony in
mind. All right?

OBS:     Thank you.

R. at 46-47. This matter was then rescheduled and a new ALJ hearing was held on September 25,

2017. At this hearing, Plaintiff obtained an attorney and her attorney was present during that

hearing.

Plaintiff also alleged that the ALJ forced her to proceed with the June 26, 2014 ALJ

hearing without an attorney. ECF No. 35, at 7. Plaintiff stated that the ALJ stated off the record

that "no more time will be afford (sic) to find an attorney, because you had one, that is no longer

on the case, and we must move on." Id. at 7-8. Plaintiff then alleged that when asked on the

record whether she wished to continue without representation, the ALJ nodded her head until

Plaintiff said "yes." Id. The undersigned does not give much weight to this argument as the

Record does not support this allegation nor has Plaintiff provided more than a mere allegation.

Furthermore, the opinion written by the ALJ after this hearing was conducted was vacated as to

disability prior to July 9, 2015 by the Appeals Council and the ALJ was ordered to review the

case again in light a new evidence. See R. at 1291 ("I want you to know the decision I'm going

to make is a new decision; it's not affected by any of the prior determinations made on your current application.".

Accordingly, the undersigned **FINDS** that plaintiff was informed of her ability to contact counsel to discuss her case at the June 26, 2014 ALJ hearing and chose to continue with the hearing. Furthermore, the undersigned also **FINDS** that the ALJ told Plaintiff that she could postpone her March 1, 2017 ALJ hearing to discuss her case with counsel, which Plaintiff chose to do, and was actually represented at the rescheduled September 25, 2017 ALJ hearing.

### 3. Was Plaintiff adequately represented by counsel?

As discussed above, a plaintiff does not have an absolute right to be represented by counsel during the pendency of the plaintiff's case. Duggan v. Barnhart, 66 F App'x 730 (9th Cir. 2003); Cornett v. Astrue, 261 F. App'x 644 (5th Cir. 2008); Russell v. Chater, 62 F.3d 1421 (8th Cir. 1995); Slavin v. Commissioner, 932 F.2d 598 (7th Cir. 1991). Therefore, because there is no guaranteed right to counsel, there is no applicable ineffective assistance of counsel claim in an appeal for social security benefits.[3] Bates v. Astrue, 2011 WL 1113474 (S.D.S.C. March 24, 2011). However, the undersigned analyzes the adequacy of Plaintiff's attorney's representation in order to determine whether Plaintiff's attorney's representation was so lacking as to essentially render Plaintiff proceeding *pro se* so as to determine whether the ALJ had a heightened duty to develop the record. See Sims v. Harris, 631 F.2d 26 (4th Cir. 1980).

First, Plaintiff's counsel objected holding the ALJ hearing via video because she was unaware that anyone had agreed to proceed by video. Second, Plaintiff's counsel objected to several exhibits, one for failure to be signed by a physician and another because the medical records that were provided were for another person. Moreover, Plaintiff's counsel questioned

---

[3] The undersigned in no way commenting, analyzing, or deciding whether Plaintiff has, may have, or will have a successful ineffective assistance of counsel claim through other remedies.

Plaintiff further regarding her need to use medical devices; her treatment throughout the period at issue; her difficulties with her medication, including side effects. Plaintiff's counsel scrupulously reviewed the difficulties surrounding Plaintiff's diagnoses, questioning Plaintiff on what her doctors wrongly believed her diagnoses to be and Plaintiff's repeated requests for different medication for various reasons. Furthermore, Plaintiff questioned Inez Fuller, Plaintiff's mother extensively regarding her knowledge of Plaintiff's diagnoses and disabilities. Plaintiff's counsel cross-examined the vocational expert. The undersigned finds that Plaintiff's Counsel provided adequate defense of her claim during the ALJ hearing and that because of this Plaintiff was not effectively proceeding *pro se* and the ALJ did not have a *heightened* duty to develop the record at the September 25, 2017 hearing, but did have a *heightened* duty to develop the record at the June 26, 2014 hearing.

Plaintiff also had a second attorney, Alicia Morado, who represented Plaintiff from March 18, 2015 until November 2, 2016. B13B, B19B. Plaintiff complained that her attorneys failed to obtain medical records. This attorney, however, provided medical records from TMC and Banner University (UAMC) to the Commissioner for their consideration. See id. Furthermore, Plaintiff's counsel Morado was incapable of subpoenaing witnesses because she did not represent Plaintiff during a hearing that would allow that to occur. The undersigned also **FINDS** that Plaintiff's Counsel Alicia Morado adequately represented Plaintiff to not render Plaintiff proceeding *pro se*.

### 4.   Did the ALJ adequately develop the record?

A plaintiff "has a right to appear before the administrative law judge to present evidence and state his or her position." 20 CFR § 416.1450(a). Plaintiffs are entitled to such hearings that are full and fair. Sims v. Harris, 631 F.2d 26 (4th Cir. 1980). Failure to provide such a hearing

requires remand, upon a showing that "absence of counsel created clear prejudice or unfairness to the claimant." Id. Furthermore, an ALJ has a duty to explore all relevant facts and inquire into issues necessary for adequate development of the record and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986).  In *pro se* cases, ALJs have "a duty to assume a more active role in helping claimants develop the record." Id.  The ALJ is permitted to question witnesses, request evidence, and subpoena witnesses. 20 C.F.R. §§ 404.944, 404.950(d). Furthermore, the ALJ may request that claimant obtain medical evidence, even at the expense of the Social Security Administration's Office.

The only time that Plaintiff was unrepresented, and during which an ALJ hearing took place, was June 26, 2014. During the times that Plaintiff was represented, the ALJ was still required to provide a full and fair hearing, but Plaintiff's attorney was there to adequately represent Plaintiff's interests and ensure that Plaintiff was meeting her burden to demonstrate her disability. 20 CFR § 416.912. Therefore, the undersigned is analyzing whether there was clear prejudice or unfairness to Plaintiff by the absence of counsel at the June 26, 2014 ALJ hearing.[4] The undersigned then analyzes whether the ALJ developed the record as required under the law during the September 25, 2017 ALJ hearing.

First, the ALJ reviewed background information that is normally presented in the case, including: Plaintiff's address, age, and education. The ALJ then inquired in to Plaintiff's abilities to perform everyday tasks and inquired into her medications and ailments associated with Plaintiff's diagnoses. The ALJ questioned Plaintiff about her doctor's visits and how often she

---

[4] The undersigned would note that the opinion from this ALJ hearing was vacated as to Plaintiff's disability. Plaintiff has not shown how the outcome of this first hearing has had any effect on the second decision. Plaintiff did not specifically allege that the first ALJ failed to adequately develop the Record, but has objected to the discrepancies between the two decisions. As this is a *pro se* Plaintiff, the undersigned is reviewing her objection as if it was made against both ALJs.

goes to the Emergency Room. The ALJ also questioned Plaintiff about her missing the

redetermination evaluation appointments. The ALJ even stated that:

> Q:    So it's really important that you attend those, because without that
>       information, I have very information to be able to make a decision on.
>       Okay?
> A:    Mm-hmm.
> Q:    That's why I wanted to send you on those. So please make sure that you
>       attend those. If you don't show up, it's going to come back here and I'm
>       not going to have that to look at. Okay?
> Q:    So at this time, 1:00, I'm going to close the hearing and we'll schedule
>       you for two consultative evaluations. Once I get all that information, I'll
>       make a decision on your case, and you'll get it at your home address a
>       couple of months down the line. Okay?

The ALJ discussed medical records that had not been provided to the ALJ.

> OBS:   But I have the names of the hospitals with more records.
> ALJ:   Well what you need to do is just go through those records and see if you
>        can get more. Okay? The last thing I have in here—by the way, I have
>        January, 2014; I have records from—
> OBS:   Tucson Medical?
> ALJ:   Nope.
> OBS:   She has records at Tucson Medical—
> ALJ:   No.
> OBS:   --from a most recent visit, like two weeks ago.
> ALJ:   No. No. That wouldn't be in here. That's too soon. Yeah. What you need
>        to do is you need to go over to the health providers, the hospital, or
>        wherever, and tell them that you need to get those records for Social
>        Security. And they should give them to you. They shouldn't charge you
>        for them. I say that, but I'm not in control.
> OBS:   Yeah, because they told me $24.
> ALJ:   $24 for your own records. That's crazy.
> OBS:   Yes, ma'am.
> ALJ:   That's just crazy. At TMC?
> OBS:   Yes
> ALJ:   Any they're your own records.
> OBS:   [INAUDIBLE] wanted $25; TMC wanted $24. And that's why we don't
>        have them because I was injured, but I'm not receiving funds for my
>        injury. Like I'm off work and my fiancé is carrying my weight right now.
> ALJ:   Mm-hmm.

. . .

| | |
|---|---|
| OBS: | And one of those guys hit me in the back of the bus—hit the back of the bus and messed up his hip. Long story short, I don't have the money to pay for Precious' stuff. But I can try to budget it out of the next monies coming— |
| ALJ: | Okay. All right. |
| OBS: | And see if we can get—is there any way we can sign a release and you all could receive those? |
| ALJ: | you know, you can do that. But it's going to take longer. She didn't sign releases before? They're not in the file? Usually they sign a whole bunch of them. They're in the file. |
| OBS: | Oh, no. Mr. Alex told her sign for the hospitals at that time. She's been to other—well one specialist and-- |
| ALJ: | And where is Alex? Is he here in Tucson. |
| OBS: | He's here in Tucson. |
| ALJ: | Okay. |
| OBS: | One location was on Campbell or something? |
| ALJ: | Campbell and First? |
| OBS: | Yeah. And so he had her sign releases. But at that time, she hadn't been to all the care providers she's been to at this date. |
| . . . | |
| ALJ: | There is a lot of outstanding medical records in this case that we need to get ahold of in addition to the consultative evaluations that you need to attend to, Ms. Scott. Okay? |
| CLMT: | Yes, ma'am. |
| ALJ: | So we're going to try to get records from TMC, UAMC, El Rio, [inaudible]. And Ms. Fuller, I'm going to ask that you get whatever the mental health records are there; the literacy thing that you're talking about. Try to get that back to us within 30 days. |
| OBS: | Yes, ma'am. |

The Record indicates that the medical records from El Rio, TMC, and Banner University (UAMC) were obtained and made part of the Record, as the ALJ stated she was going to do. See B20F, B19F, B26F. In consideration of the fact that the ALJ thoroughly questioned Plaintiff and sought out missing medical records, and sent the Plaintiff to a reevaluation appointment, the undersigned **FINDS** that the ALJ has discharged his duty of assuming a more active role during the June 26, 2014 hearing. Craig v. Chater, 76 F.3d 585 (4th Cir. 1996) (the ALJ discharged his duty of assuming a more active role in helping develop record when ALJ questioned plaintiff about all relevant matters, questioned family members, gathered information about plaintiff's

education, ability to read and write, work, daily activities, and complaints of pain, and reviewed medical records); see contra Fleming v. Barnhart, 284 F. Supp. 2d 256 (D. Md. 2003) (the ALJ failed to comply with his duty when there were serious gaps in plaintiff's medical records when treatment was sought).

During September 25, 2017, the ALJ did not have a *heightened* duty to develop the record, however, was still required to explore all relevant facts and inquire into issues necessary for adequate development of the record. Plaintiff alleged that the following medical records were not requested by the ALJ (presumably referring to: Claiborne Memorial Medical Center, Glen Wood Hospital, Homer Hospital,[5] VibrantCare Rehabilitation, Literacy Connects, COPE, Nationwide Vision). During the September 25, 2017 ALJ hearing, there is no mention of missing medical records. The ALJ reviewed the medical records presented, adequately questioned Plaintiff about her education, physical ailments, education, and general background information. Without notification that there may be missing medical records or an indication that there was missing or gaps in medical records, the ALJ does not know to seek out this information. While the first ALJ (June 26, 2014) was notified that there were missing medical records, the second ALJ cannot read Plaintiff's mind regarding her case. The ALJ developed the record significantly, even though Plaintiff was represented by an attorney. Accordingly, the undersigned **FINDS** that both ALJs adequately developed the Record as required under the law.

   5. **Did the Agency perform a redetermination in a timely manner as required under the regulations?**

When individuals turn at least 18 years old, said individual was eligible for social security benefits, and was eligible for the benefits the month before the month that an individual turned 18 years old, the Commission will re-determine said individual's benefits. 20 C.F.R.

---

[5] The Record does reflect some medical records from Homer Hospital have been obtained. There is no record of which record dates Plaintiff is referring. R. 483-557

416.987(a). An individual's eligibility will be re-determined "either during the 1-year period beginning on your 18th birthday or, in lieu of a continuing disability review," or when its determined that an individual is subject to redetermination. 20 C.F.R. 416.987(c).

Plaintiff alleges that she was "not re-determined at the age of 18. There is no Exhibit to cite due to the process ***not*** being completed. Therefore, The Social Security Administration did not abide by its law in section 1614(a)(3)(H). The Social Security Administration ONLY evaluation prior to the Plaintiff turning 18 is date March 27, 2006. Until July 14, 2004 no other evaluation had been performed and the Plaintiff was 19 years old 9 months 10 days old on that date, closer to 20 than 18." ECF No. 35, at 10.

Plaintiff's claim is difficult to discern. Plaintiff argued that she was not properly re-determined two months prior to Plaintiff's 18th birthday as required by the regulations. However, the regulations do not require a re-determination two months prior to the individual's birthday. Rather, as the Government points out, after an individual turns 18, the Commissioner uses an adult disability determination factors to determine either within one year from the claimant's 18th birthday or whenever its determined that the Claimant's is subject to the redetermination is required.

However, Plaintiff was required to participate in the redetermination process approximately three months following her 18th birthday. Plaintiff failed to attend the re-determination and this triggered the cancelation of her benefits. Plaintiff's failure to show up for her appointments is the reason that her redetermination took so long. There is also no indication that during the time that Plaintiff turned 18 until 6 months later when her benefits were canceled (March 25, 2013), Plaintiff was not prejudiced as a result of the later determination. Accordingly,

the undersigned **FINDS** that Plaintiff's claim is not supported by the regulations nor is substantiated by the facts in this case.

## VI.   <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that

> Plaintiff's Motion for Summary Judgment (ECF No. 35) be **DENIED in FULL**, Defendant's Motion for Summary Judgment (ECF No. 58) be **GRANTED in FULL** and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party shall have fourteen days from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is **DIRECTED** to provide a Copy of this Report and Recommendation of counsel of record, as provided in the Administrative Procedures for

Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Additionally, as this report and recommendation concludes the referral from the District Court, the Clerk is further **DIRECTED** to terminate the magistrate judge's association with this case.

Respectfully submitted this July 30, 2019

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE